*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2019 UT 8**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

C.R. ENGLAND,
*Plaintiff-Appellant,*

*v.*

SWIFT TRANSPORTATION COMPANY;
SWIFT TRANSPORTATION COMPANY OF ARIZONA;
and SWIFT TRANSPORTATION SERVICES,
*Defendants-Appellees.*

No. 20170561
Filed February 27, 2019

On Certification from the
United States District Court for the District of Utah
The Honorable Dee V. Benson
Case No. 2:14-CV-781-DB

Attorneys:

Scott A. Hagen, Robert O. Rice, Michael K. Erickson,
Salt Lake City, for appellant

Stephen E. Hale, Bryan S. Johansen, Rachel L. Wertheimer,
Salt Lake City, for appellees

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS,
JUSTICE PEARCE and JUSTICE PETERSEN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1    In this case[1] we are asked to interpret, and ultimately
overturn, a rule we established in *St. Benedict's Development Co. v.*

---

[1] This case comes to us as a certified question from the Federal
District Court, District of Utah.

*St. Benedict's Hospital.*[2] In *St. Benedict's* we held that to prevail on a claim for intentional interference with contract, the plaintiff must show that the defendant interfered through "improper means."[3] C.R. England, Inc. (England) argues that *St. Benedict's* was wrongly decided and should, therefore, be overruled.

¶2    In so arguing, England asserts that the factors for overruling precedent we established in *Eldridge v. Johndrow*[4] — (1) the persuasiveness of the authority and (2) how firmly the precedent has become established in law — weigh in England's favor. We disagree. Because the "improper means" element has become firmly embedded in Utah law since *St. Benedict's* was decided, and because it remains a good rule, we decline to overturn it.

¶3    Additionally, we are asked to clarify what constitutes improper means for the purposes of a claim for intentional interference with contract. In *Leigh,* we explained that the element of "improper means is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules," or if "they violate an established standard of a trade or profession."[5] And in *St. Benedict's* we applied this definition of improper means to claims involving existing contracts.[6] We reaffirm this definition[7] and clarify

---

[2] 811 P.2d 194 (Utah 1991).

[3] The court in *St. Benedict's* actually held that the plaintiff must show that the defendant interfered through improper means or *with an improper purpose*, but our decision in *Eldridge v. Johndrow* subsequently eliminated the improper purpose prong. 2015 UT 21, ¶ 14, 345 P.3d 553. For this reason, we do not refer to the improper purpose prong when discussing *St. Benedict's* or *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982), the case upon which our decision in *St. Benedict's* relied.

[4] 2015 UT 21, ¶ 22.

[5] *Leigh*, 657 P.2d at 308 (citation omitted) (internal quotation marks omitted).

[6] 811 P.2d at 201.

[7] We note, however, that we have defined improper means by referring to a non-exhaustive list. In other words, by reaffirming the language in *Leigh* we are not suggesting that the improper means
(continued)

that to constitute an "established standard of a trade or profession," the standard or rule must be an objective one accepted throughout the relevant industry.

## Background[8]

¶4 England is a trucking company. As part of its business, it trains and hires individuals to work as truck drivers. To protect its investment in training individuals to work as truck drivers, England enters into employment contracts wherein the truck drivers agree to work exclusively for England for a nine-month period.[9] England alleges that it has previously provided notice of these agreements to other trucking companies, and that it also provides notice on an ongoing basis when competing companies seek to hire England drivers who are still within the nine-month period.

¶5 Swift Transportation Company (Swift) is also a trucking company. England alleges that Swift regularly and knowingly induces England's truck drivers to breach their employment contracts with England by offering higher wages and better benefits.

¶6 In response to this activity, England filed suit against Swift, alleging that Swift intentionally interfered with England's contracts with its employees. Swift filed a motion for summary judgment against England on the ground that England failed to provide proof of "improper means"—an allegedly essential element of the tort—to support its claim.[10] In its opposition, England argued that "improper means" is not an element of the tort of intentional interference with

---

prong of the tort could not be satisfied by improper conduct that does not fit squarely in one of the categories set out in *Leigh*.

[8] The information set out in this background section comes from the federal district court's order certifying questions to us.

[9] Each agreement also provides that England will forgive the driver's tuition debt if the driver completes the nine-month exclusive work period.

[10] Swift argues that the elements of the tort of intentional interference with contract are found in *St. Benedict's Development Co. v. St. Benedict's Hospital*, 811 P.2d 194 (Utah 1991). Under *St. Benedicts*, the elements of the tort are "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations (2) . . . by improper means, (3) causing injury to the plaintiff." *Id.* at 200.

contract in Utah. Instead, it maintained that it must prove only that (1) Swift had knowledge of England's employment agreements with its truck drivers, (2) Swift recruited the drivers, (3) the drivers went to work with Swift, and (4) England suffered damages as a result, unless the "action causing the breach was done with just cause of excuse."[11]

¶7    Noting conflicting holdings in the federal district court of Utah regarding the elements of the tort of intentional interference with contract, the federal court requested supplemental briefing from the parties. Upon reviewing the briefing, the court concluded that there appears to be no "clear, controlling Utah law" regarding whether "improper means" is required as part of the tort. Additionally, the court concluded that if improper means is required, there is no clear law regarding what would constitute improper means.

## Standard of Review

¶8    This case comes to us by certified question from the federal district court. "A certified question from the federal district court does not present us with a decision to affirm or reverse a lower court's decision; as such, traditional standards of review do not apply."[12] Instead, we merely answer the question presented without resolving the underlying dispute.[13] We have jurisdiction pursuant to Utah Code section 78A-3-102(1) and article VIII, section 3 of the Utah Constitution.

## Analysis

¶9    This case requires us to answer two questions. First, does the tort of intentional interference with contract require proof of "improper means"? And second, if it is required, what constitutes "improper means" in the context of tortious interference with contract?

¶10 England argues that the elements of the tort of intentional interference with contract come from our opinion in *Bunnell v. Bills*.[14]

---

[11] Quoting *Bunnell v. Bills*, 368 P.2d 597, 602 (Utah 1962).

[12] *U.S. Fid. & Guarantee Co. v. U.S. Sports Specialty Ass'n*, 2012 UT 3, ¶ 9, 270 P.3d 464 (citation omitted).

[13] *Id.*

[14] 368 P.2d 597 (Utah 1962).

In *Bunnell*, we adopted the rule that "one who persuades another or conspires with another to breach a contract is guilty of an actionable tort, unless such persuasion or other action causing the breach was done with just cause of excuse."[15] England argues that this should still be the law in Utah, and, to the extent subsequent cases have stated a different rule, we should overrule them under the factors for overturning precedent we articulated in *Eldridge v. Johndrow*.[16]

¶11 Swift, on the other hand, argues that our decisions in *Leigh Furniture & Carpet Co. v. Isom*[17] and *St. Benedict's Development Co. v. St. Benedict's Hospital*[18] govern. According to Swift, *Leigh* established a three-part test for the tort of intentional interference with economic relations, which includes interference with both existing and prospective contracts. We agree with Swift.

¶12 Although the court in *Leigh* did not clearly state whether its three-part test applied to the tort of intentional interference with contract, the court in *St. Benedict's* later interpreted *Leigh* as having done so.[19] And following *St. Benedict's*, Utah courts have regularly stated that the element of "improper means" is part of the prima facie case for intentional interference with contracts.[20] Because the rule established in *St. Benedict's* has become firmly established in Utah caselaw, and the reasoning behind it remains persuasive, we decline to overturn it.

### I. We Decline to Overturn *St. Benedict's* and We Hold that "Improper Means" is an Element of the Tort of Intentional Interference with Contract

¶13 We first consider whether "improper means" is an element of the tort of intentional interference with contract. England argues

---

[15] *Id.* at 602.

[16] 2015 UT 21, ¶ 22, 345 P.3d 553.

[17] 657 P.2d 293 (Utah 1982).

[18] 811 P.2d 194 (Utah 1991).

[19] *Id.* at 200.

[20] *See Eldridge*, 2015 UT 21, ¶ 13; *Jones & Trevor Mktg., Inc. v. Lowry*, 2010 UT App 113, ¶ 17, 233 P.3d 538; *ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 254 (Utah Ct. App. 1997), *overruled on other grounds by Eldridge*, 2015 UT 21, ¶ 37.

that we should disavow any language from our decision in *St. Benedict's Development Co. v. St. Benedict's Hospital*[21] that includes the element of "improper means" as part of the tort of intentional interference with contract. The court in *St. Benedict's* based its decision on language in *Leigh Furniture & Carpet Co. v. Isom*.[22] But, according to England, the language in *Leigh* applied only to the related, but distinct, tort of intentional interference with prospective economic relations. For this reason, England argues that *St. Benedict's* interpretation of *Leigh*—as including the "improper means" element in the torts of intentional interference with contracts and prospective contracts—is incorrect.

¶14 Swift disagrees with England's reading of our caselaw. According to Swift, our decision in *Leigh* established elements for the tort of interference with economic relations, which "protects both existing contractual relationships and those not yet reduced to formal contract or not expected to be."

¶15 Although *Leigh* is best read as having applied only to the tort of intentional interference with prospective contracts, *St. Benedict's* clearly extended the *Leigh* test so that it applied to claims involving existing contracts as well as prospective ones. Because this resulted in a sound rule that has become firmly embedded in Utah law, we decline to overturn it.[23]

*A. Before* Leigh, *the tort of intentional interference
with contract required some showing of improper
or unprivileged conduct by defendant*

¶16 Due to the debate surrounding the development of the tort of intentional interference with economic relations, we first consider

---

[21] 811 P.2d 194 (Utah 1991).

[22] 657 P.2d 293 (Utah 1982).

[23] We also note that it is possible that "improper means" would be part of Utah law even in *St. Benedict's* absence. This is so because dicta in *Leigh*, which stated that under previous cases something equivalent to a lack of improper conduct was an affirmative defense rather than part of the plaintiff's prima facie case, appears to have incorrectly stated the law in Utah. In other words, the cases decided before *Leigh* also arguably required some showing of improper conduct as part of the plaintiff's prima facie intentional interference with contract claim.

the origins of the legal theory in Utah. Specifically, it should be noted that Utah's caselaw has always held that a defendant could not be found liable for intentionally interfering with an existing contract absent proof that the interference was unexcused or unjustified. And, based on a review of the caselaw from other jurisdictions, it appears that an unexcused or unjustified interference is widely viewed as the functional equivalent of interference by an "improper means" or an "improper purpose."[24]

---

[24] *See Elgin v. Montgomery Cty. Farm Bureau*, 549 So. 2d 486, 488–89 (Ala. 1989) (explaining that the plaintiff could not prove lack of justification because the insurance company acted pursuant to its contractual right); *Waldroup v. Lindman*, 28 P.3d 293, 296–97 (Alaska 2001) (holding that the plaintiff had to show that the defendant's actions were motivated by spite rather than economic interest to fulfill "lack of justification" requirement); *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 31–32 (Ariz. 2002) (stating that the most important factors in the improper conduct test are the nature of the conduct and the motive). A statement in *Leigh* clearly shows that a lack of justification is the equivalent to "improper means" or "improper purpose." *See Leigh*, 657 P.2d at 305. In *Leigh*, the jury instructions only required the jury to find that the defendant's action was "[w]ithout justification." *Id.* Although the court in *Leigh* determined that improper means or purpose must be found, it affirmed the jury's finding of liability because "[u]nder the trial court's definition of 'justification,' the jury had to find that the Corporation's conduct was 'wrongful or malicious' before they could find for [the plaintiff]," and according to the court "[t]hose terms are functionally equivalent to 'improper means or improper purpose.'" *Id.*

Additionally, we note that many of the cases we cite in this opinion refer to "spite," "motive," or some other analog to the element of "improper purpose." Although the "improper purpose" prong is no longer part of the tort in Utah, *see generally Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553, we nevertheless rely on these cases for the proposition that those courts require some level of impropriety, even where the operative language in their caselaw calls for a showing of a lack of justification or excuse. In citing these cases we in no way suggest that proof of an improper *purpose* is an element of the tort in Utah.

¶17 In Utah, the tort of intentional interference with contract has always required some proof that the alleged interference was done with some level of impropriety. In *Bunnell v. Bills*, the case on which England's entire argument relies, the court held that "one who persuades another or conspires with another to breach a contract is guilty of an actionable tort, *unless such persuasion or other action causing the breach was done with just cause of excuse.*"[25] It also explained that "even though a defendant's action brings about a breach of contract, he is not liable where the breach was caused by the doing of an act which he had a legal right to do."[26] The court then explained that "[w]here persons have merely pursued their own ends without any desire or intention of causing another to breach his contract, they should not be held liable for the other's breach."[27] So under *Bunnell*, a person could be held liable for the tort of intentional interference with contract only if the person interfered in a way in which the person was not legally entitled to have interfered. *Bunnell's* inclusion of an "unexcused conduct" component was consistent with the approach followed in other jurisdictions at that time and since.

¶18 The court in *Bunnell* purported to ground its decision in "generally recognized [law] in a majority of jurisdictions."[28] Because *Bunnell* was decided in 1962—twenty-three years after the first

---

[25] 368 P.2d 597, 602 (Utah 1962) (emphasis added).

[26] *Id.*

[27] *Id.* at 603. In support, the court in *Bunnell* cites *Gammon v. Federated Milk Producers Ass'n,* which states that "there is no liability for procuring a breach of contract where the breach is caused by the exercise of an absolute right—that is, an act which a person has a definite legal right to do without any qualification." 360 P.2d 1018, 1022 (Utah 1961). And *Gammon*, in turn, cites the American Law Reports, which states that "a party to a contract, whether of employment or otherwise, has a right of action against a person who has procured a breach of such contract by the other party thereto *otherwise than in the legitimate exercise of his own rights*" and "it is universally recognized that an action will lie for inducing breach of contract *by resort to means in themselves unlawful.*" M.C. Dransfield, Annotation, *Liability for Procuring Breach of Contract*, 26 A.L.R.2d 1227 (originally published in 1952) (emphasis added).

[28] *Bunnell*, 368 P.2d at 602.

Restatement was published and seventeen years before the second Restatement was published, the first and second Restatements act as helpful bookends in our survey of the "generally recognized [law] in a majority of jurisdictions" at the time.[29] Accordingly, we look to the Restatements of Torts, and cases in other jurisdictions that have interpreted the Restatements' language, as persuasive authority.

¶19 These sources suggest that the unexcused or unjustified conduct element discussed in *Bunnell* is synonymous with the "improper" interference element adopted in *Leigh* and *St. Benedict's*. For example, even though the first Restatement describes the tort as an interference done by "one . . . without a privilege to do so"[30] and the second Restatement describes it as an interference done by "[o]ne who intentionally and improperly interferes,"[31] the factors provided by the first and second Restatements for determining whether an interference was actionable—*i.e.* lacked privilege or was improper— are substantially similar.[32] So between the first and second Restatements there is no substantive difference between an unexcused interference and an improper one.[33]

---

[29] *Id.*

[30] RESTATEMENT (FIRST) OF TORTS § 766 (AM. LAW INST. 1939).

[31] RESTATEMENT (SECOND) OF TORTS § 766 (AM. LAW INST. 1979).

[32] For example, the first Restatement lists five factors for determining whether an interference lacked privilege: "(a) the nature of the actor's conduct, (b) the nature of the expectancy with which his conduct interferes, (c) the relations between the parties, (d) the interest sought to be advanced by the actor and (e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." RESTATEMENT (FIRST) OF TORTS § 767 (AM. LAW INST. 1939). And the second Restatement lists all of the same factors for determining whether an interference is improper. RESTATEMENT (SECOND) OF TORTS § 767 (AM. LAW INST. 1979). The second Restatement also adds two other factors: "the actor's motive" and "the proximity or remoteness of the actor's conduct to the interference." *Id.*

[33] Importantly, neither Restatement describes who has the burden of proving, or disproving, the wrongful nature of the interference.

¶20 The same is true in other jurisdictions.[34] For example, in *RAN Corp. v. Hudesman*, the Supreme Court of Alaska noted a discrepancy in the terminology used in previous cases.[35] Alaska's prima facie intentional interference with contract case required the plaintiff to prove that "the defendant's conduct was not privileged or justified."[36] On the other hand, it noted that the second Restatement "speaks not in terms of 'privilege,' but requires that the actor's conduct not be 'improper,'" while "[o]ther authorities use the catch word 'malice.'"[37] Ultimately, the court concluded that "[r]egardless of the phrase that is used, the critical question is what conduct is not 'privileged' or 'improper' or 'malicious.'"[38] In other words, the *Hudesman* court concluded that even though different authorities use different terms, each authority is attempting to identify certain conduct that is improper in the context of the tort of intentional interference with contract.

¶21 As these additional authorities suggest, there is little substantive difference between requiring the plaintiff to prove that an intentional interference with a contract was without justification and requiring the plaintiff to prove that it was improper. So even though the court in *Bunnell* used the "without justification" terminology in describing the elements of the tort, it is clear that even under that decision some intentional interferences with a

---

[34] *See, e.g.*, *WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1173–74 (Del. 2012) (explaining that the element of absence of justification is the equivalent of improper means); *Martin v. Fed. Life Ins. Co.*, 440 N.E.2d 998, 1007–08 (Ill. App. Ct. 1982) (explaining that the element of "intentional and malicious inducement" is the equivalent of without justification or privilege), *abrogated on other grounds by McInerney v. Charter Golf, Inc.*, 680 N.E.2d 1347 (Ill. 1997); *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 317 (Mo. 1993) (explaining that the element of absence of justification is the equivalent of improper means); *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (same).

[35] 823 P.2d 646, 648 (Alaska 1991).

[36] *Id.* (citation omitted). The "privilege" language used in Alaska's caselaw is the same language used in the first Restatement.

[37] *Id.* (citation omitted).

[38] *Id.*

contract do not rise to the level of tortious conduct. So before a plaintiff prevails on an intentional interference with contract claim, the trial court must decide whether the interference was unexcused or improper.

*B. It is unclear if* Bunnell *decided the question of whether a showing of improper conduct is part of the prima facie case or whether the lack of improper conduct is an affirmative defense*

¶22 Although it is clear that *Bunnell* included an unexcused or improper conduct component in the tort of intentional interference with contract, this does not answer the key question in this case. This is so because it is unclear whether *Bunnell* placed the burden for showing that an alleged interference occurred without an excuse on the plaintiff, as part of the prima facie case, or on the defendant, as an affirmative defense. In other words, although *Bunnell* suggests that a defendant is not liable for intentionally interfering with a contract unless the defendant's conduct was unexcused or improper, this does not necessarily mean that "improper means" is an element of a plaintiff's prima facie case. Instead, *Bunnell* could be interpreted as adopting what is called the prima facie approach. Under this approach, "the plaintiff need only prove . . . that the defendant intentionally interfered with his [contractual] relations and caused him injury."[39] Once this is proven, "the burden . . . then shifts to the defendant to demonstrate as an affirmative defense that under the circumstances his conduct, otherwise culpable, was justified and therefore privileged."[40]

¶23 Even though *Bunnell* does not clearly state who has the burden of showing that an interference was improper (or proper in the case of the defendant), dicta in *Leigh* suggests that *Bunnell* placed the burden on the defendant.[41] While the court in *Leigh* considered which elements to include in the related tort of intentional interference with prospective economic relations, it mentioned that *Bunnell* had "assumed" the prima facie approach in the context of the tort of intentional interference with contract. But the *Leigh* court

---

[39] *Leigh*, 657 P.2d at 302.

[40] *Id.* at 302–03.

[41] *Id.*

does not explain why it believed that *Bunnell* followed the prima facie approach, and the court in *Leigh* may have erred on this point.[42]

¶24 After stating that *Bunnell* assumed the prima facie approach for the tort of intentional interference with contract, the court in *Leigh* declined to apply the prima facie approach for the tort of interference with prospective economic relations because it "requires too little of the plaintiff."[43] And after considering and rejecting a second approach to the tort,[44] the *Leigh* court decided to adopt a third approach that had been established in Oregon.

¶25 Under this third approach, the plaintiff "must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff."[45] Significantly, the court announced this test as part of what it considered to be Utah's first instance of formally recognizing the "common–law cause of action for intentional interference with prospective economic relations."[46] For this reason, it appears the *Leigh* court's standard was meant to apply only to the tort of intentional interference with

---

[42] The *Leigh* court's reading of *Bunnell* could be based on an assumption that when the court in *Bunnell* used the term "justification," it was referring to an affirmative defense. Although it is true that "justification" is typically a term used to describe an affirmative defense, this does not seem to be the case when it is used in the context of the tort of intentional interference with contract. *See, e.g., RAN Corp.*, 823 P.2d at 648 (explaining that Alaska's prima facie intentional interference with contract case required the plaintiff to prove that "the defendant's conduct was not privileged or justified" (citation omitted)). So it appears that the dicta in *Leigh* was based on an incorrect assumption regarding the "lack of justification" component of the tort.

[43] *Leigh*, 657 P.2d at 303.

[44] The court considered the second Restatement approach, which requires the court to consider several factors before deciding whether the defendant's conduct was "improper." *See id.* at 303–04.

[45] *Id.* at 304.

[46] *Id.*

prospective economic relations, and not to the already-existing tort of intentional interference with contract.

*C.* St. Benedict's *interpreted* Leigh *as holding that a showing of improper means is part of the plaintiff's prima facie case for claims involving existing contracts as well as prospective ones*

¶26 Although it appears that the court in *Leigh* was not attempting to alter the elements for the tort of intentional interference with contract, this court later interpreted *Leigh* as if it had.[47] In *St. Benedict's Development Co. v. St. Benedict's Hospital*, we noted that *Leigh* was the first case to "recognize[] the tort of intentional interference with economic relations."[48] And we explained that the "tort protects both existing contractual relationships and prospective relationships of economic advantage not yet reduced to a formal contract."[49] We then announced that the three-part test first articulated in *Leigh*, including the improper means element, applied to situations involving existing contracts.[50] So following *St. Benedict's*, a showing of improper means became part of the plaintiff's prima facie case for claims involving existing contracts as well as prospective ones. This rule has never been questioned by a Utah state court.

*D. Under the factors established in* Eldridge, *we decline to overrule* St. Benedict's

¶27 Because *St. Benedict's* clearly extended *Leigh's* three-part test to claims involving existing contracts, England asks us to overrule it. England argues that the court in *St. Benedict's* misread *Leigh*, and therefore the rule set out in *St. Benedict's* should be disavowed. Although we agree that the court in *St. Benedict's* misread *Leigh*, we do not believe—under the test for overturning precedent we

---

[47] *St. Benedict's*, 811 P.2d at 200.

[48] *Id.* In doing so, the court adopted the term "interference with economic relations" as an umbrella term for the torts of intentional interference with contracts and intentional interference with prospective contracts.

[49] *Id.*

[50] *Id.*

established in *Eldridge*—that this error warrants overturning the law *St. Benedict's* established.

¶28 In *Eldridge*,[51] we established two factors to consider before overturning an earlier case: "(1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down." Neither of these factors weighs in favor of overturning the rule established in *St. Benedict's*.

¶29 First, the rule *St. Benedict's* established rests on a firm legal footing. Although *St. Benedict's* application of *Leigh's* three-part test to alleged interferences with existing contracts appears to have been the result of a misreading of the *Leigh* opinion, England fails to present a compelling reason for getting rid of it.

¶30 As our discussion of *Bunnell* illustrates, even before *Leigh* and *St. Benedict's*, Utah law most likely required a plaintiff to show that a defendant had interfered in an improper or inexcusable way to prevail on a claim for intentional interference with contract. So even if the *St. Benedict's* court erred by attributing the inclusion of the "improper means" element to *Leigh*, it was nevertheless correct in requiring the plaintiff to prove that the defendant had interfered with the contract through something akin to improper means.

¶31 What is more, by requiring a plaintiff to prove some form of improper, wrongful, unexcused, or unjustified conduct as part of its prima facie case, *St. Benedict's* merely adopted the approach followed in the vast majority of jurisdictions that recognize the tort of intentional interference with contract.[52] So even if the court in

---

[51] 2015 UT 21, ¶ 22.

[52] *Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 620–21 (W.D. Ky. 2009); *Mina Inv. Holdings Ltd. v. Lefkowitz*, 184 F.R.D. 245, 252 (S.D.N.Y. 1999); *Waldroup v. Lindman*, 28 P.3d 293, 296–97 (Alaska 2001); *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 31 (Ariz. 2002); *Vowell v. Fairfield Bay Cmty. Club, Inc.*, 58 S.W.3d 324, 328–29 (Ark. 2001); *Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 871 (Colo. 2004); *Varley v. First Student, Inc.*, 119 A.3d 643, 655 (Conn. App. Ct. 2015); *WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1173–74 (Del. 2012); *Kirkland v. Tamplin*, 645 S.E.2d 653, 655 (Ga. Ct. App. 2007); *Kutcher v. Zimmerman*, 957 P.2d 1076, 1087 (Haw. Ct. App. 1998); *Mitchell v. Weiger*, 409 N.E.2d 38, 40 (Ill. App.
(continued)

*St. Benedict's* based its rule on an incorrect reading of *Leigh*, it nevertheless articulated a sound rule[53] with which the majority of other jurisdictions agree.[54]

¶32 The second *Eldridge* factor also weighs in favor of reaffirming *St. Benedict's*. In determining how firmly precedent has become established in the law, we typically consider "the age of the precedent, how well it has worked in practice, its consistency with

---

Ct. 1980); *G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 571 N.E.2d 1363, 1370 (Mass. 1991); *Wood v. Herndon & Herndon Investigations, Inc.*, 465 N.W.2d 5, 8 (Mich. Ct. App. 1990); *Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982); *Collins v. Collins*, 625 So. 2d 786, 790 (Miss. 1993); *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 317 (Mo. 1993); *Nostrame v. Santiago*, 61 A.3d 893, 901–02 (N.J. 2013); *Thimjon Farms P'ship v. First Int'l Bank & Tr.*, 837 N.W.2d 327, 334 (N.D. 2013); *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995); *Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equip.*, 919 P.2d 443, 446 (Okla. Civ. App. 1994); *Willamette Quarries, Inc. v. Wodtli*, 781 P.2d 1196, 1200 (Or. 1989); *Triffin v. Janssen*, 626 A.2d 571, 574 (Pa. Super. Ct. 1993). And in most jurisdictions where the plaintiff must show a lack of justification or privilege, the courts equate a lack of justification or privilege with "improper means." *See, e.g.*, *WaveDivision Holdings, LLC*, 49 A.3d at 1173–74; *Kutcher*, 957 P.2d at 1088; *Triffin*, 626 A.2d at 574.

[53] The rule is sound because it furthers the principle first articulated in *Bunnell*, and reiterated in *Leigh* and *Eldridge*, that a defendant should not be held liable for conduct in which the defendant had a legal right to engage. *See Bunnell*, 368 P.2d at 602 (explaining that a defendant "is not liable where the breach was caused by the doing of an act which he had a legal right to do"); *Leigh*, 657 P.2d at 307 (explaining that "[t]he law offers no remedy for" the "inevitabl[e] damage" one competitor causes another "[i]n the rough and tumble of the market place"); *Eldridge*, 2015 UT 21, ¶ 50 (disavowing the improper purpose prong of *Leigh* because it "allow[ed] juries to find even the most commonplace commercial conduct tortious").

[54] We are not bound, of course, by the rules established in other jurisdictions. But the fact that our approach is consistent with the approach followed by a majority of jurisdictions is evidence that we have adopted a rule that works well in practice.

other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned."[55] These factors support reaffirming *St. Benedict's.*

¶33 First, we decided *St. Benedict's* approximately twenty-eight years ago, and since that time, Utah appellate courts have consistently noted that "improper means" is an element of a claim for intentional interference with contract.[56]

¶34 For example, in *Jones & Trevor Marketing, Inc. v. Lowry*, the court of appeals dismissed the plaintiff's claim because of a lack of evidence of an improper means or purpose.[57] In that case, the district court had granted summary judgment against the plaintiff due to insufficient evidence supporting its claim for intentional interference with contract. The court of appeals affirmed the district court because the evidence that allegedly supported the plaintiff's claim was inadmissible, and even if it were admissible, it "d[id] not demonstrate an improper purpose or means."[58] Accordingly, the court of appeals applied *Leigh's* three-part test to a claim for interference with an existing contract and affirmed summary judgment for a lack of evidence supporting the improper means prong. So *Jones* (as well as the other cited cases) suggests that the element of "improper means" has been consistently applied since we decided *St. Benedict's.*[59]

---

[55] *Eldridge*, 2015 UT 21, ¶ 22.

[56] *Jones & Trevor Mktg., Inc. v. Lowry*, 2010 UT App 113, ¶ 17, 233 P.3d 538; *ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 254 (Utah Ct. App. 1997); *Mumford v. ITT Commercial Fin. Corp.*, 858 P.2d 1041, 1043 (Utah Ct. App. 1993).

[57] 2010 UT App 113, ¶ 17.

[58] *Id.*

[59] As further evidence that *St. Benedict's* has been consistently applied, we note that Utah's model jury instruction includes "improper means" as an element for the tort of intentional interference with economic relations, which encompasses claims for interference with existing contracts as well as prospective ones. *See* MODEL UTAH JURY INSTRUCTION 2D CV 1401. Although we do not review our model jury instructions for correctness, and have noted that they may not correctly state the law in Utah, *see Jones v. Cyprus Plateau Mining Corp.*, 944 P.2d 357, 359 (Utah 1997) (explaining that

(continued)

¶35 Second, as we have already stated, the rule established in *St. Benedict's* is a sound one that works well in practice.[60] It is clear and straightforward, and it ensures that a party will not be found liable for engaging in conduct in which the party was legally entitled to engage. For these reasons, the rule is one on which people can reasonably rely. Because the rule established in *St. Benedict's* has been applied consistently for twenty-eight years, and is one on which people can reasonably rely, we conclude that it has become firmly established in Utah law.

¶36 England argues, however, that *St. Benedict's* has not become firmly embedded in Utah law because three cases, decided after *St. Benedict's*, cited *Bunnell* without discussing *St. Benedict's* three-part test.[61] But upon closer scrutiny, none of those cases supports England's position. For example, in *Retherford*, we cited *Leigh* and *Bunnell* for the proposition that to prevail on its "claim of malicious interference with contractual relations," the plaintiff had to prove that the defendant "intentionally and improperly persuaded [a contract party] to breach its implied employment contract with [the plaintiff]."[62] By citing *Leigh* for the proposition that a claim for interference with an existing contract required proof that a defendant had "improperly" interfered with the contract, *Retherford* supports, rather than contradicts, *St. Benedict's* reading of *Leigh*. And the same is true of the other two cases England cites.[63]

---

the model jury instructions "are merely advisory and do not necessarily represent correct statements of Utah law"), the inclusion of the "improper means" element in the model instructions suggests that Utah's district courts regularly apply the "improper means" element to claims involving existing contracts, and that people generally have begun to rely on the rule.

[60] *See supra* ¶ 31 & n.53.

[61] England cites *Retherford v. AT&T Communications of Mountain States, Inc.*, 844 P.2d 949, 967 (Utah 1992); *Hill v. State Farm Mutual Automobile Insurance Co.*, 829 P.2d 142, 149 (Utah Ct. App. 1992); and *American Airlines v. Christensen*, 967 F.2d 410, 413 n.4 (10th Cir. 1992).

[62] *Retherford*, 844 P.2d at 967.

[63] *Christensen*, 967 F.2d at 413 n.4 (noting that it did not matter whether it applied the standard set out in *Bunnell* or the standard in *Leigh*, because the result would be the same); *Hill*, 829 P.2d at 149

(continued)

¶37 England also argues that *St. Benedict's* is not firmly embedded because "in subsequent years . . . courts applying Utah law have adopted various approaches to the relationship between the two interference torts." But England is able to cite only federal district court cases for this proposition. And, once again, those cases do not stand for what England claims they do. For example, only one of the cases England cites stands for the assertion that "a claim of tortious interference with contract does not require proof of improper means."[64] But that assertion is based solely on a Tenth Circuit case that was decided five years before our decision in *St. Benedict's*.[65]

¶38 The other cases England cites provide even less support for its position. Although the cases appear to make some distinction between the tort of intentional interference with contract and the tort of intentional interference with prospective contracts rather than using the umbrella term "intentional interference with economic relations," each of the cases nevertheless requires a defendant to have interfered "improperly" before liability for interference with a contract is found.[66] So even in the instances where federal courts did

(requiring proof that defendant "improperly" interfered with an existing contract).

[64] *Advanced Recovery Sys., LLC v. Am. Agencies, LLC*, No. 2:13CV283DAK, 2017 WL 680391, at *6 (D. Utah Feb. 21, 2017). In its order certifying these questions to us, the federal district court cited this case as evidence that Utah's caselaw is unclear. Because this case relies on a single Tenth Circuit case decided before *St. Benedict's*, it is a poor indication of any alleged confusion surrounding this area of law.

[65] *Id.* (citing *Jones v. Intermountain Power Project*, 794 F.2d 546, 554 (10th Cir. 1986)), *abrogated by Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820 (1990).

[66] *StorageCraft Tech. Corp. v. Persistent Telecom Sols., Inc.*, No. 2:14-CV-76-DAK, 2016 WL 7155782, at *10 (D. Utah Dec. 6, 2016) (requiring an intentional and improper interference); *Critical Nurse Staffing, Inc. v. Four Corners Health Care Corp.*, No. 2:13-CV-646 TS, 2014 WL 2739279, at *3 (D. Utah June 17, 2014) (same); *Ecosure Pest Control, Inc. v. Eclipse Mktg., Inc.*, No. 2:09-CV-1108, 2010 WL 3363071, at *2 (D. Utah Aug. 23, 2010) (same); *MacArthur v. San Juan Cty.*, 416 F. Supp. 2d 1098, 1182 (D. Utah 2005) (same).

not adopt *St. Benedict's* formula verbatim, they have required plaintiffs to plead and to prove something roughly equivalent to "improper means."

¶39 Because the weight of authority supports *St. Benedict's* adoption of the "improper means" element for the tort of intentional interference with contract, and because this element has become firmly embedded in Utah law, we reaffirm it.[67]

## II. We Hold that "Improper Means" Requires Proof that an Action was Contrary to a Statute, Regulation, Common Law Rule, or an Established Standard of a Trade or Profession

¶40 Next, we must determine what constitutes "improper means." England argues that inducement of a breach of an existing contract constitutes improper means. Swift, on the other hand, argues that improper means is conduct "contrary to law, such as violations of statutes, regulations, . . . recognized common-law rules" or "the violation of an established standard of a trade or profession." We agree with Swift.

¶41 Since *Bunnell v. Bills*, we have recognized that a defendant should not be liable for interfering with a contract where the interference was caused by the defendant's "doing of an act which he had a legal right to do."[68] In *Leigh Furniture & Carpet Co. v. Isom*[69]

---

[67] Throughout its brief, England argues that we must eliminate the improper means element for claims involving existing contracts in order to distinguish between interferences with existing contracts and interferences with prospective contracts. But we do not believe that this is necessary, because the nature of a contract already provides such a distinction. This is so for three reasons. First, the existence of a prospective contract will be much more difficult to prove than the existence of an existing contract. Second, causation and damages will also be more difficult to prove for an alleged prospective contract than they will for an existing contract. And third, improper means will be easier to prove with existing contracts than with merely prospective contracts because of the greater protection laws, regulations, and customs provide for existing contracts.

[68] 368 P.2d 597, 602 (Utah 1962).

[69] 657 P.2d 293, 307 (Utah 1982).

and *St. Benedict's Development Co. v. St. Benedict's Hospital*,[70] we followed this principle by including the element of "improper means" as part of a claim for tortious interference with economic relations—either with existing contracts or merely prospective economic relationships. In *Leigh* we acknowledged that "[i]n the rough and tumble of the marketplace, competitors inevitably damage one another in the struggle for personal advantage," but we explained that "[t]he law offers no remedy for those damages—even if intentional—because they are an inevitable byproduct of competition."[71] For this reason, it was necessary to limit the scope of actionable conduct, by including an improper purpose or means element, to conduct in which the defendant did not have a recognized legal right to engage.

¶42 In doing so, we defined improper means narrowly to include only those actions that "are contrary to law, such as violations of statutes, regulations, or recognized common-law rules," or actions that violate "an established standard of a trade or profession."[72] After defining improper means in this way, the court in *Leigh* provided a non-exhaustive list of conduct that would constitute improper means: "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood[s]."[73] And we noted that because "[s]uch acts are illegal or tortious in themselves" they "are clearly 'improper' means of interferences."[74]

¶43 When we expanded the *Leigh* test to apply to interference with existing contracts in *St. Benedict's*, we also adopted the *Leigh* standard for what constitutes improper means.[75] Following our decision in *St. Benedict's*, courts have consistently interpreted the

---

[70] 811 P.2d 194, 201 (Utah 1991).

[71] 657 P.2d at 307.

[72] *Id.* at 308 (citation omitted).

[73] *Id.* (citation omitted).

[74] *Id*. In contrast to the clearly improper means described, the court in *Leigh* explained that "[a] deliberate breach of contract, even where employed to secure economic advantage, is not, by itself, an 'improper means.'" *Id*. at 309.

[75] *St. Benedict's*, 811 P.2d at 201.

"improper means" element in accordance with the definition outlined in *Leigh* and *St. Benedict's*.[76]

¶44  More recently, in *Eldridge v. Johndrow*,[77] we emphasized once again that a person is not liable for intentional interference where the person engaged only in conduct in which he or she was legally entitled to engage. In that case we disavowed the "improper purpose" prong that had previously been part of the *Leigh* standard because it "allow[ed] juries to find even the most commonplace commercial conduct tortious."[78] We noted that this was problematic because "such a tort would interfere with 'much competitive commercial activity, such as a businessman's efforts to forestall a competitor in order to further his own long-range economic interests.'"[79] So by eliminating the improper purpose prong, *Eldridge* furthered our expressed goal of limiting the scope of actionable conduct to that conduct in which the defendant did not have a legally recognized right to engage.[80]

¶45  Accordingly, from *Bunnell* to *Eldridge*, we have been careful to limit the scope of actionable conduct within the tortious interference context to those situations where a defendant employs a

---

[76] *Pratt v. Prodata, Inc.*, 885 P.2d 786, 788 (Utah 1994) (citing *Leigh*), *overruled on other grounds by Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553; *Sampson v. Richins*, 770 P.2d 998, 1003 (Utah Ct. App. 1989) (same); *see also Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 36, 221 P.3d 205 ("Defamation would be a means contrary to the common law."); *Mumford v. ITT Commercial Fin. Corp.*, 858 P.2d 1041, 1044–45 (Utah Ct. App. 1993) (explaining that conduct amounting to common law conversion would constitute improper means).

[77] 2015 UT 21, ¶ 50.

[78] *Id.* As a result of our decision in *Eldridge*, a plaintiff must prove that a defendant interfered by using improper means—proof of an improper purpose is no longer sufficient.

[79] *Id.* ¶ 46 (citation omitted).

[80] To be clear, under our improper means standard the conduct need not constitute illegal conduct under a criminal statute. Instead, it need only be contrary to law in a general sense, such as a violation of a statute, regulation, recognized common-law rule, or an established standard of a trade or profession.

means that is independently tortious or wrongful.[81] We see no reason to depart from this approach.

¶46 As a final note, Swift asks us to clarify what would constitute a violation of an established standard of a trade or profession. Specifically, Swift argues that our standard is the equivalent of the standard adopted in California, which specifies that only violations of rules or standards that "provide for, or give rise to, *a sanction or means of enforcement for a violation*" should suffice for improper means.[82] But California's standard is more limited than any standard ever applied in a Utah appellate court. Instead, Utah appellate courts typically require only that the industry standard or rule "be an external and objective one, rather than the individual judgment, good or bad, of the particular actor."[83]

---

[81] This definition is consistent with the definition given in other jurisdictions. *See Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 622 (W.D. Ky. 2009) ("Under Kentucky law, significantly wrongful conduct certainly includes fraudulent misrepresentation, deceit, coercion, threats of illegal conduct, and physical violence, which are specifically highlighted as improper acts."); *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1102–03 (N.Y. 2004) (requiring proof of an "independently unlawful act" to prevail on a tortious interference claim); *Thimjon Farms P'ship v. First Int'l Bank & Tr.*, 837 N.W.2d 327, 335 (N.D. 2013) ("[I]n order to recover for wrongful interference with business, the plaintiff must prove the defendant's conduct was independently tortious or otherwise unlawful." (alteration in original) (citation omitted) (internal quotation marks omitted)); *see also Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 725–26 (Tex. 2001) ("It appears that in most Texas cases in which plaintiffs have actually recovered damages for tortious interference with prospective business relations, the defendants' conduct was either independently tortious—in the four cases noted, defamatory or fraudulent—or in violation of state law.").

[82] *Stevenson Real Estate Servs., Inc. v. CB Richard Ellis Real Estate Servs., Inc.*, 42 Cal. Rptr. 3d 235, 242 (Cal. Ct. App. 2006) (emphasis added).

[83] *Walker v. Anderson-Oliver Title Ins. Agency, Inc.*, 2013 UT App 202, ¶ 20, 309 P.3d 267 (citation omitted) (internal quotation marks omitted).

¶47 For example, in *Walker v. Anderson-Oliver Title Insurance Agency, Inc.*, the court of appeals affirmed summary judgment against a plaintiff's tortious interference claim because "the evidence [the plaintiff] offer[ed] [was] legally insufficient to establish a title insurance industry standard," and, therefore, the plaintiff could not prove improper means.[84] In doing so, the court explained that "[e]stablishing an industry standard requires more than evidence of a particular company's rules and policies."[85] Instead, the court explained that the plaintiff needed to provide evidence "to establish the existence of an industry-wide standard."[86] This could be done, according to the court, in the same way an industry standard is established in the negligence context.[87] We adopt *Walker's* approach to this issue.

¶48 In sum, we reaffirm our definition for improper means as conduct contrary to law—such as violations of statutes, regulations, or recognized common-law rules—or the violation of an established standard of a trade or profession.[88] Additionally, in regards to established standard of a trade or profession, we adopt the approach followed in *Walker*, and hold that the violation of an objective,

---

[84] *Id.* ¶ 19.

[85] *Id.* ¶ 20.

[86] *Id.* ¶ 21.

[87] *See id.* ¶ 20; *see also Wessel v. Erickson Landscaping Co.*, 711 P.2d 250, 253–54 (Utah 1985) (relying on the Uniform Building Code to establish an industry standard for construction of a retaining wall); *Crandall v. Ed Gardner Plumbing & Heating*, 405 P.2d 611, 612 (Utah 1965) (relying on testimony from other plumbers about general practices to establish that a defendant-plumber violated industry standards); *Wal–Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 894 (Ind. 2002) (noting that the mere existence of a company's internal corporate policy did not create a legal duty to a plaintiff); *Wal–Mart Stores*, 774 N.E.2d at 895 (explaining that "[t]he standard of conduct which the community demands must be an external and objective one, rather than the individual judgment, good or bad, of the particular actor." (alteration in original) (quoting W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 32, at 173–74 & n.3 (5th ed. 1984) (internal quotation marks omitted))).

[88] Once again we emphasize that this is a non-exhaustive list.

industry-wide standard or rule may constitute improper means. And under the *Walker* approach, the existence of an objective, industry-wide standard may be established in the same way it is established in the negligence context (through expert testimony regarding industry-wide customs or practices, uniform codes, industry-specific regulations, etc.).

## Conclusion

¶49 Because the element of improper means is firmly established in Utah law, and rests upon a firm legal footing, we decline to overturn *St. Benedict's Development Co. v. St. Benedict's Hospital.*[89] We also reaffirm the definition of improper means provided in *Leigh Furniture & Carpet Co. v. Isom*[90] and *St. Benedict's*. And we clarify that to prove the element of improper means based on an alleged violation of an established industry rule or standard, the plaintiff must provide evidence of an *objective*, industry-wide standard.

--------

[89] 811 P.2d 194 (Utah 1991).

[90] 657 P.2d 293 (Utah 1982).