**2024 UT App 137**

# THE UTAH COURT OF APPEALS

ENGLAND LOGISTICS, INC.; ENGLAND CARRIER SERVICES, LLC; AND
C.R. ENGLAND, INC.,
Appellees,
*v.*
KELLE'S TRANSPORT SERVICE, LLC, ET AL.,[1]
Appellants.

Opinion
No. 20220997-CA
Filed October 3, 2024

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 180909680

Troy L. Booher, Caroline A. Olsen, Taylor P. Webb,
and Lincoln W. Hobbs, Attorneys for Appellants

Jeffery S. Williams, Walter A. Romney, Shannon K.
Zollinger, and Justin R. Olsen,
Attorneys for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DAVID N.
MORTENSEN concurred.

TENNEY, Judge:

¶1 Several years ago, Kelle's Transport Service (referred to in this case as Soar) hired away some employees of C.R. England and its related affiliates (collectively, C.R. England). But these employees had each signed noncompete agreements while employed by C.R. England. C.R. England later sued, raising

---

1. Additional appellants include Tim Zack, Chris Nielsen, Casey Brown, Caleb Kuhn, Ryan Butler, Austin Butler, Joseph Charlton, Jim Quinn, Cody Isaacson, Raun Singleton, and Marc Kramer.

claims against both Soar and the departed employees. After several years of litigation, the case went to trial. At the close of trial, a jury found in C.R. England's favor on some of its claims, including that the employees had breached their noncompete agreements and that Soar had intentionally interfered with economic relations. But the jury awarded only a small amount of damages, and it also found against C.R. England on several of its claims. The district court later granted C.R. England's request for costs, and it also granted C.R. England's request for the attorney fees that it had incurred prosecuting its claims for breach of the noncompete agreements.

¶2      Soar now appeals, raising various arguments relating to the rulings and verdicts entered below. We resolve the arguments presented to us as follows:

- We affirm the district court's conclusion that the noncompete agreements were enforceable under Utah law.

- We reverse the district court's denial of Soar's motion for judgment as a matter of law on the intentional interference with economic relations claim.

- We affirm the district court's awards of costs and attorney fees to C.R. England.


BACKGROUND

¶3      C.R. England is one of the largest refrigerated trucking companies in the country, and through several of its affiliate companies, it provides various services to others involved in the trucking industry. Soar is a smaller trucking company and is a competitor of C.R. England. C.R. England and Soar are both headquartered in Salt Lake County.

¶4      In 2017 and 2018, Soar was growing and sought to hire people with experience and skill in the trucking industry. During

this period, Soar hired away eight C.R. England employees (the Employees), each of whom had held a management or senior role with C.R. England.

¶5    Of note, the Employees had each previously signed noncompete, nondisclosure, and non-solicitation agreements (collectively, the noncompete agreements) with C.R. England in order to receive or maintain their employment with the company. With minor variations, the noncompete agreements prohibited the Employees from accepting employment with, operating, or conducting any business "which competes in any areas of the Company Businesses" in which they "have worked or have been privy to Confidential Information," in any "state, county, city or other recognized geographic area within the United States, or any foreign country in which the Company is conducting or has conducted business at any time." The noncompete agreements stated that these restrictions lasted for one year following the end of employment with C.R. England. Soar was aware that the Employees had signed these noncompete agreements, but Soar believed the agreements were unenforceable, so it promised the Employees that it would "back them up" if C.R. England "sought to enforce their noncompete obligations."[2]

¶6    C.R. England later filed suit against both Soar and the Employees. C.R. England raised fourteen causes of action. These included nine breach of contract claims—one for each of the eight Employees' alleged violations of the noncompete agreements, and another against Soar for violating a transportation brokerage agreement it had with C.R. England. C.R. England also brought several tort claims against all of the defendants, including claims

---

2. Soar made good on its promise and paid for the representation of the Employees, and the various defendants were represented by the same counsel throughout the proceedings (though they sometimes filed motions individually or in smaller subgroups, especially prior to trial). Unless otherwise indicated, references to Soar's litigation actions refer to actions taken on behalf of the company and the Employees.

for intentional interference with economic relations, civil conspiracy, violating the Utah Uniform Trade Secrets Act, and violating the Utah Unfair Competition Act. Finally, C.R. England brought a claim for unjust enrichment solely against Soar.

¶7 Before trial, the parties stipulated to a preliminary injunction. This injunction prohibited the Employees from sharing with Soar any confidential information that they had learned while working for C.R. England. By agreement, this preliminary injunction would last "during the pendency of this case."

¶8 The case proceeded to a four-day trial. During this trial, much of the testimony established the details set forth above, including how Soar had hired the Employees and about the nature of the noncompete agreements. For purposes of this appeal, we note two particular developments.

¶9 First, during its case, C.R. England introduced deposition testimony from Mica Bolta. Bolta was an executive recruiter in the trucking industry and had assisted Soar in recruiting the Employees. Bolta testified about her observations of the industry practice regarding noncompete agreements. Bolta testified that in "[her] experience in the logistics industry . . . it is usually frowned upon to switch employers and to try and solicit customers or employees within the first 12 to 24 months, depending on what your nonsolicit agreement says." C.R. England disclosed Bolta as a fact witness prior to trial, but it did not disclose her as an expert witness.

¶10 Second, at the close of C.R. England's case, Soar moved for judgment as a matter of law on all of C.R. England's claims pursuant to rule 50(a) of the Utah Rules of Civil Procedure. As part of this motion, Soar asked the court to hold that the noncompete agreements were unenforceable as a matter of law, arguing, among other things, that there was inadequate consideration. Soar also argued that the noncompete agreements were negotiated in "bad faith" because (1) the Employees were at

will and (2) the agreements were not "reasonably tailored" to C.R. England's needs where the company used the same "boilerplate contract" for its various employees. With respect to C.R. England's claim for intentional interference with economic relations, Soar asked the court to hold that there was insufficient evidence (indeed, no evidence) to establish the elements of the tort—including, of note here, that Soar had acted in "violation of statute or law" or of a "recognized custom in the industry."

¶11 The district court denied the motion as to all claims. In its ruling, the court concluded that the noncompete agreements were enforceable as a matter of law. The court noted that under a test previously set forth by the Utah Supreme Court, a noncompete agreement: (1) must "be supported by consideration," (2) cannot have involved "bad faith" "in the negotiation of the contract," (3) must "be necessary to protect the goodwill of the business," and (4) must "be reasonable in its restrictions as to time and area." *See System Concepts, Inc. v. Dixon*, 669 P.2d 421, 425–26 (Utah 1983). Applying this test, the district court first ruled that the Employees' offers of employment (whether to initiate or continue employment) "suffice[d]" for consideration in this case. Second, the court ruled that there was no bad faith because, in its view, the Employees were "in the same bargaining position as the employer." Third, the court ruled that the restrictions were necessary to protect the goodwill of C.R. England's business given "the thin, thin margins that ha[d] been testified to in the trucking industry." And fourth, the court ruled that the agreements' restrictions as to time and area were reasonable. In making this latter determination, the court noted that a one-year restriction had been upheld in several past cases, and it concluded that the restrictions at issue here were reasonable in light of evidence that had been offered about the "time when [confidential] information gets stale" in the trucking industry.

¶12 At the close of trial, the jury found that each of the Employees had violated their noncompete agreements. The jury also found Soar and its executives liable for intentional interference with C.R. England's economic relations, but it found

the three employees against whom that claim was ultimately submitted not liable.[3] The jury then found against C.R. England on its other claims, including its claims for misappropriation of trade secrets, civil conspiracy, unjust enrichment, and violation of the Utah Unfair Competition Act. Overall, C.R. England prevailed on 9 of the 14 claims that it had brought against Soar. Although C.R. England had sought $300,000 in damages, the jury awarded it just $12,000 in total damages—$6,000 for cumulative violations of the noncompete agreements and $6,000 for intentional interference with economic relations. After the jury returned its verdict, the court denied C.R. England's request for a permanent injunction.

¶13 After the verdict, Soar filed a renewed motion for judgment as a matter of law pursuant to rule 50(b) of the Utah Rules of Civil Procedure, but it did so only as to C.R. England's intentional interference with economic relations claim. In this motion, Soar argued that C.R. England had failed to present any evidence that Soar had acted with improper means—that is, means contrary to either law or established industry standards. The district court denied the motion.

¶14 Both parties later filed motions requesting attorney fees and costs. C.R. England's request for attorney fees rested on a clause in the noncompete agreements that entitled it to fees "reasonably incurred in establishing . . . violation of this Agreement" in "the event of a breach or threatened breach." The district court granted the request because C.R. England had prevailed on its claims for breach of the noncompete agreements and had successfully obtained a preliminary injunction.

---

3. As noted above, the intentional interference claim was pleaded against all of the Employees. For reasons that are a touch unclear from the record, the verdict form that was submitted to the jury identified only three of the Employees as being potentially liable on that claim.

¶15   The court also awarded costs to C.R. England pursuant to rule 54(d)(1) of the Utah Rules of Civil Procedure, which states that unless "a statute, these rules, or a court order provides otherwise, costs should be allowed to the prevailing party." The court noted that under *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119, courts may consider several factors as part of this analysis, including (1) "the number of claims, counterclaims, cross-claims, etc., brought by the parties"; (2) "the importance of the claims relative to each other and their significance in the context of the lawsuit considered as a whole"; and (3) "the dollar amounts attached to and awarded in connection with the various claims."[4]

¶16   The court assessed these factors as follows:

- The court concluded that the first factor weighed in C.R. England's favor because C.R. England had prevailed on 9 out of 14 claims against Soar, had obtained a preliminary injunction, and had defeated all of Soar's counterclaims and defenses.[5]

---

4. In *R.T. Nielson Co. v. Cook*, our supreme court considered the question of how to determine the "prevailing party" for purposes of an attorney fee award. 2002 UT 11, ¶ 25, 40 P.3d 1119. As noted, the district court here used the *R.T. Nielson* analysis to determine whether C.R. England was entitled to costs. As explained below, we have no occasion in this appeal to definitively determine whether the prevailing party analysis should proceed differently in the two contexts.

5. Soar originally asserted three "claims for relief"—which it lumped together under the heading of a singular "counterclaim"—in its response to C.R. England's first complaint. These were (1) a request for a declaratory judgment that the noncompete agreements were not enforceable, (2) a cause of action for intentional interference with contract and prospective

(continued…)

- The court concluded that the second factor also weighed in C.R. England's favor because C.R. England prevailed on or at least achieved substantial relief on the claims relating to the noncompete agreements and "the need for injunctive relief." In the court's view, the "enforceability of the [noncompete agreements] was a central issue from the outset." And the court further opined that C.R. England's request for injunctive relief "to prevent" its former employees "from using [C.R.] England's confidential information" was a "key aspect of the relief" it had sought in the case and that C.R. England had obtained "at least some" of this relief through the preliminary injunction.

- Finally, the court concluded that the third factor was "relatively neutral" because while C.R. England had prevailed on many of its monetary claims, the relief it obtained—$12,000—was "relatively nominal and well short of the $300,000" requested.

¶17   Assessing these factors together, the court concluded that where C.R. England "prevailed on more than half of [its] claims against [Soar], obtained preliminary injunctive relief, successfully defended against [Soar's] counterclaims, and obtained favorable rulings on critical issues regarding the enforceability of the [noncompete agreements]," C.R. England should be regarded as the prevailing party, even despite the relatively nominal amount

---

economic relations, and (3) a request for attorney fees and sanctions based on C.R. England's alleged bad faith litigation.

As later noted by the district court, "Soar's counterclaim was not re-pleaded in response to the Second Amended Complaint." If Soar meant to maintain its request for a declaratory judgment (and there is some evidence that it did), the claim failed on the merits when the district court ruled that the noncompete agreements were enforceable. And the district court concluded that the other claims were "abandoned" when they were not presented in any form at trial.

of the monetary award that it had received on its claims. In doing so, the court again placed particular weight on "the central nature" of the issues on which C.R. England prevailed—namely, those involving the enforceability of the noncompete agreements.

## ISSUES AND STANDARDS OF REVIEW

¶18    On appeal, Soar first argues that the district court erred in denying its rule 50(a) motion for judgment as a matter of law in which it asserted that the noncompete agreements were unenforceable. "We review a denial of a motion for judgment as a matter of law for correctness." *UMIA Ins. v. Saltz*, 2022 UT 21, ¶ 26, 515 P.3d 406 (quotation simplified).

¶19    Soar next argues that the district court erred in denying its rule 50(b) motion for judgment as a matter of law on C.R. England's claim for tortious interference with economic relations.

> In reviewing a trial court's denial of a motion for judgment as a matter of law or a renewed motion as a matter of law on the basis of insufficiency of the evidence, we follow one standard of review: We reverse only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict.

*Sheppard v. Geneva Rock*, 2021 UT 31, ¶ 25, 493 P.3d 632 (quotation simplified).

¶20    Finally, Soar challenges the district court's award of costs to C.R. England. As noted, this award was based on the court's conclusion that C.R. England was the prevailing party. "A trial court's decision to award the prevailing party its costs will be reviewed under an abuse of discretion standard." *Jensen v. Sawyers*, 2005 UT 81, ¶ 140, 130 P.3d 325 (quotation simplified); *see also Maxwell Masonry Restoration & Cleaning LLC v. North Ridge*

*Constr. Inc.*, 2022 UT App 109, ¶ 28, 518 P.3d 164 ("Whether a party is the prevailing party in an action is a decision left to the sound discretion of the trial court and reviewed for an abuse of discretion."(quotation simplified)), *cert. denied*, 525 P.3d 1265 (Utah 2023).

## ANALYSIS

### I. Enforceability of the Noncompete Agreements[6]

¶21    "To be valid and enforceable, a restrictive employment covenant must comply with" four requirements. *System Concepts, Inc. v. Dixon*, 669 P.2d 421, 425 (Utah 1983). These requirements are: (1) the covenant must "be supported by consideration," (2) "no bad faith" was involved "in the negotiation of the contract," (3) the covenant must "be necessary to protect the goodwill of the business," and (4) the covenant must "be reasonable in its restrictions as to time and area." *Id.* at 425–26. "The reasonableness of the restraints in a restrictive covenant is determined on a case-by-case basis, taking into account the particular facts and circumstances surrounding the case and the subject covenant." *Id.* at 427.

---

6. During the pendency of this appeal, the Federal Trade Commission (the FTC) adopted a rule prohibiting noncompete agreements in most circumstances. *See generally* 16 C.F.R. § 910 (2024). We note that a federal district court recently held that the FTC lacked authority to promulgate this rule. *See Ryan, LLC v. Federal Trade Comm'n*, No. 3:24-CV-00986-E, 2024 WL 3879954, at *1 (N.D. Tex. Aug. 20, 2024). In any event, on its own terms, the rule does not apply "where a cause of action related to a noncompete clause accrued prior to the [regulation's] effective date," 16 C.F.R. § 910.3(b) (2024), which is September 4, 2024, *id.* § 910.6. As such, even on its face, the rule does not apply to the noncompete agreements that are the subject of this appeal—a point Soar acknowledged at oral argument.

¶22 Below, Soar argued that the noncompete agreements were not supported by consideration and were not reasonable in their restrictions as to time and area. The district court disagreed. Soar now challenges these conclusions on appeal, but we agree with the district court on both fronts.[7]

A.    Consideration

¶23 At trial, testimony established that the Employees had signed the noncompete agreements as a condition of their employment (whether it be at the time they were hired or, instead, for continued employment), and it likewise established that each of the Employees was an at will employee. Against this backdrop, Soar now advances several arguments for why, in its view, there was insufficient consideration for the agreements. We find none of them persuasive.

---

7. C.R. England asserts that Soar did not preserve its challenges to the noncompete agreements. Soar resists this, asserting that it did indeed preserve these issues. We've reviewed the arguments and relevant portions of the record and regard the preservation question as something of a close call. But because the "preservation requirement is self-imposed" and "one of prudence rather than jurisdiction," we have discretion to choose to reach the merits of an issue without resolving the preservation dispute. *Fort Pierce Indus. Park Phases II, III, & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 13, 379 P.3d 1218 (quotation simplified); *see also State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." (emphasis omitted)). In "practice, we've often done so where the preservation question is somewhat murky but the merits question is not." *Hillam v. Hillam*, 2024 UT App 102, ¶ 43, -- P.3d --. And doing so seems further warranted if deciding the issue on the merits (as opposed to preservation) does not change which party will prevail. Since this is all true here, we choose to resolve this issue on the merits.

¶24    First, pointing to cases from other jurisdictions, Soar argues that while there is "no bright line rule" under which an offer of employment always constitutes adequate consideration, courts are nevertheless "skeptical" of whether a noncompete agreement that was signed after employment with no additional consideration satisfies the inquiry. From this, Soar asks us to conclude that there was insufficient consideration.

¶25    We're not persuaded by this argument. Regardless of what other jurisdictions have held, it's settled in Utah that an offer of employment can constitute consideration for a noncompete agreement. On this, our supreme court's decision in *Allen v. Rose Park Pharmacy*, 237 P.2d 823 (Utah 1951), is largely controlling. There, an employee agreed to a "terminable at will" employment contract, and as part of that contract, the employee further agreed to a five-year noncompete provision. *Id.* at 825. The employee later sued, asserting that the noncompete provision was invalid. *Id.* at 824. In the employee's view, "unless [a] contract provides employment for a definite period of time," it lacks consideration to support a noncompete provision. *Id.* This is so, according to the employee, because harsh and inequitable results would otherwise follow. *Id.* at 825. In his case, for example, the employer had fired him a week after he started employment, and yet the employer still sought to bind him to a years-long obligation. *Id.* at 824.

¶26    The district court agreed with the employee, ruling that the noncompete provision was unenforceable because, among other reasons, it lacked consideration. *Id.* On appeal, however, the supreme court reversed and upheld the validity of the noncompete provision. *Id.* at 828. On a foundational level, the court noted that "a contract does not lack mutuality merely because its terms are harsh or its obligations unequal." *Id.* at 825 (quotation simplified). And on the more particular question of whether there was consideration, the court held that the mutual promises in the employment offer *did* constitute sufficient consideration for all of its terms, including the noncompete provision. *Id.* at 825–26. The court explained that a "contract of employment with an exchange of promises expressing a legal

detriment and benefit to both parties" can constitute consideration for a noncompete provision. *Id.* at 825. Addressing the employee's concerns about potential inequities, the court reasoned that the good faith prong of the noncompete analysis might be implicated if an employer quickly hires and fires an at will employee with the sole intent of binding that employee to a long restrictive covenant. *See id.* at 826. And the court further reasoned that arguments about the "inequities and hardship" of a noncompete provision might go to whether "equitable grounds for rescission" exist, as opposed to questions about whether there was adequate consideration. *Id.*

¶27 True, *Rose Park Pharmacy* involved a situation in which an employee accepted employment subject to a noncompete agreement, while some of the Employees here signed noncompete agreements while employed (i.e., in exchange for continued employment). But in *System Concepts*, our supreme court noted that a similar consideration question had been "resolved" below where a district court "specifically found" that "an offer of continued employment" to an at will employee was "adequate." 669 P.2d at 426. Despite this, Soar insists that the supreme court in *System Concepts* merely approved the district court's holding but that the supreme court did "not itself weigh in on the adequacy of consideration." But even if this is true—and, thus, that *System Concepts* did not definitively settle the question—we fail to see a meaningful difference between the two scenarios. Since an offer of *new* employment can constitute valid consideration for signing a noncompete agreement, it stands to reason that an offer of *continued* employment for an otherwise terminable employee can constitute consideration too. Soar has not persuaded us otherwise, and we accordingly reject this argument.

¶28 Soar next argues that there was insufficient consideration in this case because the Employees were at will employees. In Soar's view, this matters because the Employees "could have been terminated a day after signing the noncompete yet remain bound by its restrictions." But this argument, too, is at odds with Utah law. In both *Rose Park Pharmacy* and *System Concepts*, our supreme

court held that there was sufficient consideration for the noncompete agreements even though the employees in question were at will employees. *Rose Park Pharmacy*, 237 P.2d at 825 (noting the company's "promise of employment" was "terminable at will"); *System Concepts*, 669 P.2d at 429 (noting that the employee in question "was always terminable at will"). And as noted, *Rose Park Pharmacy* explained that the remedy for "inequities and hardship incurred by enforcing the restriction when the term of employment was short and the parties['] bargaining power was unequal" would be the bad faith prong or some other "equitable ground[] for rescission," 237 P.2d at 826, neither of which Soar has advanced on appeal in this case.[8]

¶29 In any event, when it comes to whether offers of continuing employment (such as those at issue here) can constitute consideration, Soar's argument about the at will nature of the employment and the perceived equities seems backwards. As aptly explained by the Colorado Supreme Court,

> [b]ecause an employer may terminate an at-will employee at any time during the employment relationship as a matter of right, its forbearance from terminating that employee is the forbearance of a legal right. As such, we find that such forbearance constitutes adequate consideration to support a noncompetition agreement with an existing at-will employee. . . .
>
> . . .
>
> . . . Just as an at-will employee may refuse to accept initial employment if the employer's conditions are unacceptable, so too may an existing

---

8. Soar did advance an unconscionability argument below, but it has not renewed it on appeal.

> employee leave employment if she does not assent to the terms of a noncompetition agreement. . . .
>
> . . . By virtue of the nature of at-will employment itself, the presentation of [a non-competition] agreement [is] an offer to renegotiate the terms of [an employee's] at-will employment, which [an employee] accept[s] by continuing to work.

*Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061–63 (Colo. 2011) (en banc). Indeed, at least one of the authorities that Soar cites favorably in its brief seems consistent with this reasoning. *See Glisson v. Global Sec. Services, LLC*, 653 S.E.2d 85, 87 (Ga. Ct. App. 2007) (holding that a noncompete agreement offered in the middle of a two-year contract was not supported by adequate consideration because the employee was "*not* terminable at will" (emphasis added)).

¶30    Finally, Soar argues that what it perceives to be the boilerplate nature of the noncompete agreements undermines the adequacy of the consideration. But Soar cites no authority for this proposition, and we are aware of none. And we disagree with the argument anyway. If an employer provided an employee with a standardized, boilerplate contract under which the employee would receive a large sum of money in exchange for the employee's services, it would defy reason to suggest that the boilerplate nature of that contract would mean that the employee was somehow not receiving consideration for his or her services.

¶31    This isn't to say, of course, that the boilerplate nature of a contract can never impact a court's analysis of a contract. In *System Concepts*, for example, our supreme court analyzed the question of whether a noncompete agreement constituted an impermissible adhesion contract where "all employees" were required to sign it. 669 P.2d at 429. The court held that even though the agreement was "prepared in a standardized form and

presented on a take-it-or-leave-it basis," it was not an adhesion contract because the parties did not occupy an "unconscionably disparate bargaining position" in relation to each other. *Id*. In this sense, the court contemplated that the boilerplate nature of a contract could impact an unconscionability analysis. *Id.* But Soar's argument in this appeal is simply about whether there was a lack of consideration. And on that front, we disagree with Soar's argument that the perceived boilerplate nature of the contract invalidated the consideration that was offered.

¶32   In short, each of the Employees in this case was promised either new or continued employment in exchange for signing a noncompete agreement. For the reasons set forth above, we see no error in the district court's conclusion that these agreements were supported by consideration.

B.   Scope

¶33   As noted, the noncompete agreements prohibited the Employees from accepting employment with or conducting any business "which competes in any areas of the Company Businesses" in which they "have worked or have been privy to Confidential Information," in any "state, county, city or other recognized geographic area within the United States, or any foreign country in which the Company is conducting or has conducted business at any time." And the restrictions lasted for one year following the end of the Employee's employment with C.R. England.

¶34   The district court ruled that the geographic scope of these restrictions was reasonable given that the trucking industry operates "coast to coast," and it further ruled that the time restriction was "entirely reasonable" as well. Soar now challenges these determinations on several grounds, but we reject all of them.

¶35   Soar first argues that the agreements were unreasonable as to their geographic scope. In Soar's view, this is so because the

agreements "effectively precluded" former employees "from working anywhere in the trucking industry for a year."

¶36 We disagree with the assertion that the geographic scope was unreasonable. "The reasonableness of the restraints in a restrictive covenant is determined on a case-by-case basis, taking into account the particular facts and circumstances surrounding the case and the subject covenant." *System Concepts*, 669 P.2d at 427. "Of primary importance in the determination of reasonableness are the location and nature of the employer's clientele." *Id*. And "a restrictive covenant is generally enforceable if it specifies an area no greater than that to which the business extends." *Property Mgmt. Bus. Sols. v. Averitte*, No. 2:18-CV-552, 2018 WL 4327922, at *6 (D. Utah Sept. 10, 2018) (quotation simplified) (applying Utah law).

¶37 Here, trial testimony established that C.R. England is "one of the largest refrigerated carriers in the country." And the district court likewise observed that C.R. England does business "coast to coast." As a result, although the geographic restrictions in these agreements were indeed broad, they were also "limited to the area in which" the company "has been and is seeking its market." *System Concepts*, 669 P.2d at 427. Were we to invalidate them, we would be preventing C.R. England from protecting its interests in areas of the country in which it is actively doing business. We see no support for Soar's suggestion that we can or should do that. As a result, given the nature of this company and its wide-ranging operations, the geographic restrictions were reasonable.

¶38 Soar next argues that the agreements were unreasonable as to their temporal scope. Soar claims that one-year restrictions involved in these agreements lie at the "outer bounds of . . . reasonability." Soar also points out that Utah law declares as void any post-employment restrictive covenants that are greater than one year in duration. *See* Post-Employment Restrictions Act, ch. 153, § 3, 2016 Utah Laws 732, 732 (codified at Utah Code § 34-51-201(1)).

¶39　But Soar concedes that the noncompete agreements in question were signed prior to the effective date of this law (May 10, 2016), so this statute does not apply to this case. And we further note that past cases applying Utah common law have routinely approved restrictions of one year or longer. *System Concepts*, 669 P.2d at 426 (upholding a two-year restriction as "clearly, or at least 'probably,' reasonable" (citation omitted)); *Rose Park Pharmacy*, 237 P.2d at 826 (upholding a five-year restriction); *Property Mgmt. Bus. Sols.*, 2018 WL 4327922, at *5–6 (upholding a two-year restriction); *First Am. Title Ins. Co. v. Northwest Title Ins. Agency, LLC*, No. 2:15-CV-00229-DN, 2016 WL 6902473, at *17 (D. Utah Nov. 23, 2016) ("A year is reasonable for a covenant not to compete."). Indeed, Soar's counsel below conceded that "[o]ne year appears to be an acceptable period to protect an employer's legitimate interest." Because the time limitations involved in the agreements here fall within accepted limits, we see no reason for invalidating these agreements on this basis.[9]

---

9. Separate from the costs award discussed below, the district court awarded C.R. England the attorney fees that it had incurred in conjunction with establishing the breach of contract claim and obtaining the preliminary injunction. This award was based on a clause in the noncompete agreements entitling C.R. England to attorney fees "reasonably incurred in establishing . . . violations of this Agreement." On appeal, Soar challenges this attorney fee award as well, but its challenge is based on its assertion that the noncompete agreements were unenforceable. Because we rejected this argument, we affirm the award of attorney fees that was based on those same agreements.

　　Pursuant to the same clause, C.R. England also requests an award of attorney fees incurred on appeal. We grant the request and remand for a determination of those fees. *See Dillon v. Southern Mgmt. Corp. Ret. Trust*, 2014 UT 14, ¶ 61, 326 P.3d 656 ("When a party is entitled to attorney fees below and prevails on appeal, that party is also entitled to fees reasonably incurred on appeal." (quotation simplified)).

II. Intentional Interference with Economic Relations

¶40 One of C.R. England's claims was for intentional interference with economic relations. To succeed on this claim, C.R. England was required to prove: "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *Commercial Club Bldg. LLC v. Global Rescue LLC*, 2023 UT App 37, ¶ 54, 529 P.3d 382 (quotation simplified). After the jury found in C.R. England's favor on this claim, Soar filed a post-trial motion for judgment as a matter of law pursuant to rule 50(b) of the Utah Rules of Civil Procedure, arguing that there was insufficient evidence to show that Soar had acted with "improper purpose or means." The district court rejected the motion, and Soar now challenges that denial on appeal.

¶41 Our supreme court has "defined improper means narrowly." *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 42, 437 P.3d 343. According to the supreme court, this term includes "only those actions that are (1) contrary to law, such as violations of statutes, regulations, or recognized common-law rules, or (2) actions that violate an established standard of a trade or profession." *Id.* (numbering added, quotation otherwise simplified). For the reasons set forth below, we agree with Soar's assertion that there was insufficient evidence under either prong of this test. We thus reverse the district court's denial of the rule 50(b) motion.[10]

A. Contrary to Law

¶42 The first question is whether Soar's actions were "contrary to law, such as violations of statutes, regulations, or recognized

---

10. C.R. England claims that Soar did not preserve several of the arguments that it makes on appeal regarding the improper means element. We have independently reviewed the record, however, and we have determined that Soar did sufficiently preserve each of the arguments at issue.

common-law rules." *Id.* Our supreme court has "been careful to limit the scope" of this category to "independently tortious or wrongful" acts. *Id.* ¶ 45. Put differently, "a person is not liable for intentional interference where the person engaged only in conduct in which he or she was legally entitled to engage." *Id.* ¶ 44; *accord Heartwood Home Health & Hospice LLC v. Huber*, 2020 UT App 13, ¶ 32, 459 P.3d 1060. This dividing line is an important one. Were it otherwise, juries would be able "to find even the most commonplace commercial conduct tortious." *Eldridge v. Johndrow*, 2015 UT 21, ¶ 50, 345 P.3d 553.

¶43 The supreme court has offered "a non-exhaustive list of conduct that would constitute improper means: violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehoods." *Swift*, 2019 UT 8, ¶ 42 (quotation simplified). Such acts can satisfy the improper means element precisely because they "are illegal or tortious in themselves." *Id.* (quotation simplified).

¶44 The question here, then, is whether C.R. England introduced any evidence to show that Soar interfered with its contractual relations through illegal or tortious means. And as noted, the motion at issue was a *post-trial* motion for judgment as a matter of law. In the context of this case, the post-trial nature of this motion matters a great deal. As explained, the jury ruled in C.R. England's favor on various contract claims, but the jury explicitly rejected each of C.R. England's tort claims—i.e., it rejected its claims for disclosure of trade secrets, conspiracy, and violations of the Utah Unfair Competition Act. C.R. England has not challenged these verdicts on appeal, so they stand as entered. As a result, it necessarily follows that Soar did *not* engage in any independently illegal or tortious conduct. And because of this, the improper means element was not satisfied.

¶45 C.R. England nevertheless asks us to conclude that, aside from the causes of action that the jury rejected at trial, there was evidence from which the jury could infer that Soar could have been liable for fraudulent misrepresentation. In C.R. England's

view, this would have been supportable because Soar (1) lacked "any good faith basis" to induce the Employees to breach their noncompete agreements, (2) "possessed superior means of information" relative to the Employees as to the validity of the noncompete agreements yet "willfully misled them into a misconception of their status," and (3) made subsidiary misrepresentations of fact in their representations about the enforceability of the noncompete agreements. We disagree.

¶46 Among other elements, fraudulent misrepresentation requires a false representation "concerning a presently existing material *fact*." *State v. Apotex Corp.*, 2012 UT 36, ¶ 58, 282 P.3d 66 (emphasis added, quotation otherwise simplified). As such, statements "in the nature of a mere opinion" are generally not actionable. *Nielson v. Leamington Mines & Expl. Corp.*, 48 P.2d 439, 442 (Utah 1935); *accord Mellon v. International Group for Historic Aircraft Recovery*, 612 F. App'x 936, 938 (10th Cir. 2015) ("[O]nly facts, not opinions, can be actionably false."). It's thus settled in Utah that, as a general rule, "misrepresentations of law and opinions about the legal effect of contracts are not adequate bases for actionable fraud." *Utah Power & Light Co. v. Federal Ins. Co.*, 983 F.2d 1549, 1556 (10th Cir. 1993); *see also Berkeley Bank for Coops. v. Meibos*, 607 P.2d 798, 805 (Utah 1980) ("[S]tatements of opinions as to the legal effect of contracts are not generally a proper basis for a claim of fraud.").

¶47 Despite this authority, C.R. England points to statements from our supreme court indicating that a misrepresentation of law can sometimes give rise to liability for fraudulent misrepresentation. *See Drew v. Pacific Life Ins. Co.*, 2021 UT 55, ¶ 112 n.22, 496 P.3d 201; *Rapp v. Salt Lake City*, 527 P.2d 651, 655 (Utah 1974). And C.R. England also points to a statement from our supreme court suggesting that the "general rule" articulated above does not apply where a speaker "possessed superior means of information" or "willfully misled" another party "into a misconception" of its rights and liabilities under a contract. *Gadd v. Olson*, 685 P.2d 1041, 1044 (Utah 1984) (quotation simplified).

¶48   But C.R. England's reliance on *Drew* and *Rapp* is unavailing. These cases both relied on language from the Restatements—*Drew* relied on the Second Restatement of Torts, while *Rapp* relied on similar language from the First Restatement. *See Drew*, 2021 UT 55, ¶ 112 n.22 (quoting Restatement (Second) of Torts § 525 (Am. L. Inst. 1977)); *Rapp*, 527 P.2d at 655 (quoting the Restatement (First) of Torts § 525 (Am. L. Inst. 1938)). But under both cited editions of the Restatement,

> [a] statement of law may have the effect of a statement of fact or a statement of opinion. It has the effect of a statement of fact if it asserts that a particular statute has been enacted or repealed or that a particular decision has been rendered upon particular facts. It has the effect of a statement of opinion if it expresses only the actor's judgment as to the legal consequence that would be attached to the particular state of facts if the question were litigated.

Restatement (Second) of Torts § 525 (Am. L. Inst. 1977); Restatement (First) of Torts § 525 (Am. L. Inst. 1938).

¶49   The statements at issue here squarely fall into the latter camp—i.e., they were nothing more than Soar's "judgment as to the legal consequence that would be attached to the particular state of facts if the question were litigated." Restatement (Second) of Torts § 525 (Am. L. Inst. 1977); Restatement (First) of Torts § 525 (Am. L. Inst. 1938). C.R. England has not persuaded us that there was anything factual about them, much less that Soar could be charged with having "willfully misled" the Employees "into a misconception" about their rights and liabilities under the contracts. *Gadd*, 685 P.2d at 1044. As a result, we disagree with C.R. England's suggestion that these statements could constitute improper means for purposes of its intentional interference with economic relations claim.

¶50 Finally, C.R. England argues that the evidence presented at trial could also have supported a claim for fraudulent concealment. In C.R. England's view, Soar knew that the Employees were in violation of their noncompete agreements and did not disclose this to C.R. England, thereby supporting such a tort—and, by extension, the intentional interference with economic relations claims. We again disagree.

¶51 "In order to establish fraudulent concealment, a plaintiff must prove the following three elements: (1) the nondisclosed information is material, (2) the nondisclosed information is known to the party failing to disclose, and (3) there is a legal duty to communicate." *Smith v. Frandsen*, 2004 UT 55, ¶ 12, 94 P.3d 919 (quotation simplified). C.R. England has not meaningfully briefed the third element. Instead, the extent of its argument is a passing citation to a Tenth Circuit case where, in dicta, that court said that it would have upheld a sufficiency challenge to a jury verdict for tortious interference that was based on fraudulent concealment. *See Advanced Recovery Sys. v. American Agencies*, 923 F.3d 819, 825 n.8 (10th Cir. 2019) (applying Utah law). But the defendant in that case was the CEO of a corporation and thus had a contractual relationship (not to mention fiduciary duties) with the plaintiff corporation. *See id.* 822–23. That is a markedly different situation from the one at issue here where, again, the involved parties are business competitors. C.R. England has provided no support for its assertion that Soar owed any duty of disclosure to C.R. England, so we reject its assertion that the non-disclosure could have supported a verdict for intentional interference with economic relations.[11]

---

11. In its reply brief, Soar raises the possibility that C.R. England meant to apply its theory of fraudulent concealment to the Employees as well as to Soar itself. And at trial, some evidence was presented suggesting that several of the Employees lied to C.R. England or otherwise concealed the fact that they had accepted work with Soar. As Soar also points out, however, the

(continued…)

B.      Established Standards of a Trade or Profession

¶52    C.R. England next suggests that the verdict can be sustained under the second prong of the "improper means" test—which, again, looks to whether the defendant's actions "violate an established standard of a trade or profession." *Swift*, 2019 UT 8, ¶ 42 (quotation simplified). For purposes of this prong, the "existence of an objective, industry-wide standard may be established in the same way it is established in the negligence context (through expert testimony regarding industry-wide customs or practices, uniform codes, industry-specific regulations, etc.)." *Id.* ¶ 48. We agree with Soar that C.R. England failed to present any such evidence here.

¶53    At trial, C.R. England relied on the deposition of Mica Bolta, an executive recruiter in the trucking industry, to establish the industry standard with respect to honoring noncompete agreements. Among other things, Bolta testified that her "experience in the logistics industry . . . [is] that it is usually frowned upon to switch employers and to try and solicit customers or employees within the first 12 to 24 months, depending on what your nonsolicit agreement says."

¶54    As an initial matter, we note that C.R. England did not disclose Bolta as an expert witness. Seizing on this, Soar suggests that there was no competent testimony from which C.R. England could establish an industry-wide standard. In response, C.R. England points out that *Swift* appeared to leave open whether "the existence of an objective, industry-wide standard" may be established by lay testimony. *Id.* While *Swift* held that the standard "may" be established "through expert testimony regarding industry-wide customs or practices" and other methods common to "the negligence context," *id.*, it never said

_____

jury rejected C.R. England's claims for intentional interference as to each of the Employees against whom these claims were brought. As a result, this potential extension of C.R. England's argument cannot support this claim.

that is the only acceptable form. Instead, the inquiry appears to turn on whether the evidence evinces "sufficient[ly] objective qualities" such that a jury might "reasonably conclude the proposed standard is objective." *Sweet v. Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-day Saints*, No. 2:16-CV-225, 2019 WL 3306029, at *3 (D. Utah July 23, 2019) (applying *Swift*), *aff'd*, 831 F. App'x 874 (10th Cir. 2020).

¶55    We need not definitively settle this dispute. Regardless of whether lay testimony can ever suffice, Bolta did not testify to the "existence of an objective, industry-wide standard." *Swift*, 2019 UT 8, ¶ 48. Instead, Bolta repeatedly couched her assertions in subjective terms. In the passage quoted above, for example, Bolta referred only to her personal experiences. In another relevant passage from her deposition, Bolta was asked what she knew about "the practice of noncompete[] agreements within the logistics industry." In response, Bolta said,

> It was *my experience* that many candidates were found or had signed either a noncompete or a nonsolicit agreement in logistics, but that was the extent. But each one is unique, and it's usually up to the new potential employer to make an assessment on the particular agreement.

Again, *Swift* turns on the existence of an "industry-wide standard," which can be established "through expert testimony regarding industry-wide customs or practices, uniform codes, industry-specific regulations, etc." *Id.* Bolta did not testify as to the existence of any such standards, instead couching her assertions in terms of her own personalized experience.

¶56    We thus conclude that C.R. England offered no proof to satisfy either prong of the improper means test. As a result, the

district court erred in denying Soar's motion for judgment as a matter of law on this claim.[12]

### III. Costs

¶57 The district court awarded costs to C.R. England based on its determination that C.R. England was the "prevailing party." *See* Utah R. Civ. P. 54(d)(1) ("Unless a statute, these rules, or a court order provides otherwise, costs should be allowed to the prevailing party."). Soar challenges this award, but we affirm.[13]

---

12. Two additional arguments regarding the intentional interference claim warrant brief mention. First, in response to Soar's arguments, C.R. England stresses that it did disclose Bolta's deposition testimony and that Soar did not challenge its admissibility. But this misunderstands the nature of Soar's arguments, which go to the testimony's legal effect, not its admissibility. Second, in addition to arguing that there was insufficient evidence to support the improper means element, Soar argues that there was insufficient evidence to support the damages award relating to this claim. Because we've concluded that there was insufficient evidence to support the improper means element, we need not address this argument.

13. As noted above, the district court concluded that C.R. England was the prevailing party under the test set forth in *R.T. Nielson*, even though that decision considered an attorney fee award, not a costs award under rule 54(d). In their briefs, both parties have likewise referred us to cases that dealt with the prevailing party concept as it related to attorney fee awards, and neither party has suggested that there is any difference between how such an analysis should proceed across the two contexts.

We're unaware of a Utah appellate decision that has specifically considered the question of whether there is such a difference. We do note, however, that some Utah decisions seem to have assumed that the phrase means the same thing for

(continued…)

¶58   Our case law recognizes "the need for a flexible and reasoned approach to deciding in particular cases who actually is the prevailing party." *Utah Transit Auth. v. Greyhound Lines, Inc.*, 2015 UT 53, ¶ 58, 355 P.3d 947 (quotation simplified). Moreover, the "hallmark for determining which party has prevailed is not

---

purposes of both costs and attorney fee awards. *See, e.g., Ault v. Holden*, 2002 UT 33, ¶¶ 47–48, 44 P.3d 781; *Crowley v. Black*, 2007 UT App 245, ¶¶ 15–16, 167 P.3d 1087. And we further note that some federal authority suggests the phrase generally has a similar meaning in the two contexts as well. *See, e.g., Dattner v. Conagra Foods, Inc.*, 458 F.3d 98, 101 (2d Cir. 2006) ("A number of our sister circuits have ruled, and we agree, that, in general, a litigant who is a prevailing party for purposes of attorney's fees is also the prevailing party for purposes of costs."); *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 38 F.4th 1372, 1376 (11th Cir. 2022) (concluding that "there is no reason to believe" that the "definition of the legal term 'prevailing party' varies across different legal contexts"). *But see Tunison v. Continental Airlines Corp.*, 162 F.3d 1187, 1189 (D.C. Cir. 1998) ("While there may be reason in some cases to construe the term 'prevailing party' differently depending on whether attorneys' fees or only costs are at issue, we agree with Continental that the 'prevailing party' determination is generally the same in the two contexts." (quotation simplified)).

Given both the identical wording and the conceptual overlap, we're comfortable basing our analysis of whether C.R. England was the prevailing party for purposes of this costs award on cases that arose in the attorney fee context. But given the absence of any briefing on this question, we leave open the possibility that we may consider the question anew in a future case if the question is briefed and a party asks us to conclude that a different analytical framework should be applied.

As a final matter, we note that in the attorney fee context, cases have treated the phrases "successful party" and "prevailing party" the same. *See, e.g., Jordan Constr., Inc. v. Federal Nat'l Mortgage Assoc.*, 2017 UT 28, ¶ 65 n.49, 408 P.3d 296. We'll do so here as well.

whether one party has recovered money in an absolute sense, but whether the trial court's decision about who prevailed was based on an approach that was flexible and reasoned." *Neff v. Neff*, 2011 UT 6, ¶ 70, 247 P.3d 380.

¶59 In addition, because this "question depends, to a large measure, on the context of each case," it "is appropriate to leave this determination to the sound discretion of the trial court." *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119. In this sense, the abuse of discretion standard applies because "the district court is in a better position than we are as an appellate court to decide this question." *Utah Transit Auth.*, 2015 UT 53, ¶ 58 (quotation simplified). As a general matter, an "abuse of discretion occurs only if it can be said that no reasonable person would take the view adopted by the district court." *Busico v. Carver*, 2023 UT App 162, ¶ 74, 542 P.3d 956 (quotation simplified). Thus, so long as the district court could reasonably decide the question in the manner that it did, we will affirm "even if we or another court might have made a different decision in the first instance." *Hansen v. Kurry Jensen Props. LLC*, 2021 UT App 54, ¶ 19, 493 P.3d 1131 (quotation simplified). Indeed, we will affirm even if we think the district court "made the wrong call," so long as the decision that the court made fell "within the broad range of discretion" available to it. *Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2015 UT App 261, ¶ 24, 361 P.3d 703 (Orme, J., concurring, joined by Toomey, J.).

¶60 In answering the prevailing party question at issue here, the district court focused on the three factors that our supreme court has held may be "appropriate" to consider—namely, (1) "the number of claims, counterclaims, cross-claims, etc., brought by the parties"; (2) "the importance of the claims relative to each other and their significance in the context of the lawsuit considered as a whole"; and (3) "the dollar amounts attached to and awarded in connection with the various claims." *R.T. Nielson*,

2002 UT 11, ¶ 25.[14] We set forth the particulars of the court's analysis above in the Background. In brief, the court concluded that: (1) the first factor weighed in C.R. England's favor because it prevailed on 9 out of the 14 claims it raised against Soar and obtained a preliminary injunction; (2) the second factor also weighed in C.R. England's favor because it prevailed on what the court regarded as the two most significant issues in the case—the validity of the noncompete agreements and "the need for injunctive relief"; and (3) the third factor was "relatively neutral" because although C.R. England obtained some monetary damages, they were "relatively nominal and well short of" what it had requested. Assessing these factors together, the court concluded that C.R. England was the prevailing party where it had "prevailed on more than half of [its] claims against" Soar, and it again stressed "the central nature" of its successes relating to the enforceability of the noncompete agreements.[15]

¶61    We see no basis for reversing this decision. Again, a district court's prevailing party determination is reviewed deferentially.

---

14. These factors are a "helpful tool, not a required list that courts must mechanically apply." *Maxwell Masonry Restoration & Cleaning LLC v. North Ridge Constr. Inc.*, 2022 UT App 109, ¶ 42 n.10, 518 P.3d 164, *cert. denied*, 525 P.3d 1265 (Utah 2023); *see also R.T. Nielson*, 2002 UT 11, ¶ 25 (noting that, depending on the case, there could potentially be "other relevant factors"). Soar does not suggest that the court abused its discretion by focusing on these factors, nor does Soar suggest that the district court abused its discretion by not looking to some other factor as well.

15. We have, of course, now reversed C.R. England's victory on the tortious interference claim. But this does little to alter this picture. It merely shifts C.R. England's victory ratio from 9 out of 14 claims to 8 out of 14 claims, which is still past the "more than half" threshold that the district court found important. And we also note that the tortious interference claim was not one of the claims that the court believed was "central" to C.R. England's aims.

And such a determination is affirmed so long as the court's "decision about who prevailed was based on an approach that was flexible and reasoned." *Neff*, 2011 UT 6, ¶ 70. Here, the district court's decision was based on a careful weighing of the three factors recognized by the supreme court as being appropriate in such analyses, and its ultimate ruling was expressly grounded in the particular contours of this multifaceted case.

¶62    In asking us to reverse this decision, Soar first argues that the district court placed "outsized emphasis" on the centrality of the noncompete agreements. In doing so, Soar presents several reasons why, in its view, the district court should not have regarded these claims as being as important as it ultimately did.

¶63    But in terms of institutional competencies, a district court is in a better position than an appellate court to assess the relative importance of the various claims to the parties. In a multi-claim case like this one that resulted in a mixed verdict, an appellate court should therefore defer to the district court if that court offers reasoned analysis for why it believes particular claims were of central importance to the parties—and, thus, to the prevailing party determination. *See, e.g.*, *Utah Transit Auth.*, 2015 UT 53, ¶ 58 ("We have also stressed that because the identity of the prevailing party depends, to a large measure, on the context of each case, the district court is in a better position than we are as an appellate court to decide this question." (quotation simplified)). So here, the question before us is whether the district court could have reasonably viewed the dynamics of this case in this way. And we think it could. C.R. England is a large trucking company that has many competitors. C.R. England apparently has a practice of requiring its employees to sign noncompete agreements, and this practice seems driven by its desire to prevent its competitors from poaching its employees. Because of this, C.R. England may well have wanted to litigate this case precisely so that it could obtain a judicial decision affirming the validity of these agreements, thereby letting both its competitors and its employees know that these agreements are enforceable and that C.R. England will assert its rights if the agreements are violated. Because this was a

reasonable assessment of how C.R. England approached this case, we disagree with Soar's suggestion that the district court abused its discretion when it concluded that C.R. England's successes on these particular claims should carry particular weight in the prevailing party analysis.

¶64 Soar next argues that the district court improperly factored the preliminary injunction into its analysis. In Soar's view, the question in a prevailing party determination is which party "ultimately" prevailed and, as a result, intermediate relief like a preliminary injunction should generally be deemed irrelevant. In support, Soar cites an Eighth Circuit case that collected federal authority on the subject. *Northern Cheyenne Tribe v. Jackson*, 433 F.3d 1083, 1086 (8th Cir. 2006) ("[V]irtually every circuit court to consider the question has concluded that a preliminary injunction granting temporary relief that merely maintains the status quo does not confer prevailing party status."). But Soar points to no Utah authority on the subject, and we are aware of none. And even the Eighth Circuit case acknowledges a few exceptions, including when a "party's claim . . . for [a] permanent injunction is rendered moot by the impact of the preliminary injunction." *Id.*

¶65 In any event, we do agree that as something of a loose guide, pretrial successes that were only temporary in nature should carry minimal weight in a post-trial prevailing party analysis. But even so, the prevailing party determination ultimately remains a highly contextual one. And here, the district court reasoned that a "key aspect" of C.R. England's purpose in litigating this case was its desire to "prevent" its former employees "from using [C.R.] England's confidential information." In ruling on the enforceability of the noncompete agreements, the district court found that the one-year time restriction was reasonable, in part, because of what the court viewed as the relatively fast rate at which "information gets stale" in the trucking industry. Because the preliminary injunction in this case lasted three years, the district court could therefore reasonably conclude that this preliminary injunction had served an important purpose even without the subsequent issuance of a

permanent injunction. Indeed, when the district court denied the request for a permanent injunction at the end of trial, it stated that after three years, it didn't "think there [was] anything left at risk." Thus, in the context of this case, the district court could reasonably conclude that the preliminary injunction alone had supported C.R. England's litigation goals and that it therefore could support the conclusion that C.R. England was the prevailing party (even if this preliminary injunction might not have justified that determination on its own).

¶66    Finally, Soar argues that the court misapplied the third factor—i.e., "the dollar amounts attached to and awarded in connection with the various claims." *R.T. Nielson*, 2002 UT 11, ¶ 25. As noted, C.R. England sought over $300,000 in damages, but the jury awarded C.R. England just $12,000 in damages on the claims for which it prevailed. And because $6,000 of that amount was based on the intentional interference claims that we've now reversed, the amount of recovery now stands at $6,000, which is just 2% of what C.R. England sought.

¶67    In considering this factor, we recognize that district courts must consider "the amounts actually sought" and then "balance them proportionally with what was recovered." *Busico*, 2023 UT App 162, ¶ 63 (quotation simplified). And if this were a case in which this factor predominated, we would certainly agree that this factor should have weighed heavily against any conclusion that C.R. England was the prevailing party. *Cf. Maxwell Masonry Restoration & Cleaning LLC v. North Ridge Contr. Inc.*, 2022 UT App 109, ¶ 46, 518 P.3d 164 (concluding that a party was not the prevailing party where it had obtained only 7% of its requested damages).

¶68    But in the broader universe of civil litigation, we also recognize that some cases are not necessarily driven (either exclusively or primarily) by a desired monetary recovery. Certain kinds of public interest and civil rights litigation come to mind, as do any number of other kinds of decisions. Here, C.R. England was seeking a monetary award, and the district court was well

aware of this. And yet even so, the district court still concluded that other aspects of this case mattered to C.R. England as well—including, as discussed, C.R. England's desire to obtain a ruling affirming the general enforceability of its oft-used noncompete agreements, as well as its desire to stop the Employees from divulging any confidential information they had regarding C.R. England's operations (even if this prohibition was only temporary in nature). In this sense, the district court seems to have concluded that while C.R. England was of course hoping to obtain a large monetary judgment, this wasn't its only litigation goal.

¶69 Again, the monetary award is just one of the factors at issue in the prevailing party analysis. While we agree that it will likely be the driving factor in many (perhaps even most) cases, we also recognize that some cases exist in which other factors matter as much or more too. *See, e.g.*, *Wihongi v. Catania SFH LLC*, 2020 UT App 109, ¶ 26, 472 P.3d 308 ("[T]he proposition that any one factor is dispositive runs counter to the common-sense, factor-based approach consistently applied by Utah courts."); *Grove Bus. Park LC v. Sealsource Int'l LLC*, 2019 UT App 76, ¶ 51, 443 P.3d 764 ("Although the comparison of [a party's] award to its claim is a relevant factor under the prevailing party analysis, . . . the factor cannot be weighed in isolation."). Moreover, we again note that the question of "whether a party is the prevailing party in an action is a decision left to the sound discretion of the trial court and reviewed for an abuse of discretion." *Maxwell Masonry*, 2022 UT App 109, ¶ 28 (quotation simplified). And as a general matter, an "abuse of discretion occurs only if it can be said that no reasonable person would take the view adopted by the district court," and such questions are "necessarily context specific." *Busico*, 2023 UT App 162, ¶ 74 (quotation simplified).

¶70 Here, we conclude that part of a district court's discretion in the prevailing party determination is the ability to apportion relative weight amongst the various factors. So long as that decision is a reasonable one, we must defer. And in this case, we note that the district court considered the parties' arguments

about the prevailing party question at some length—its analysis of this question spans several pages of its written decision.

¶71 In light of all this, even if some members of this court might believe that, because the monetary judgment factor was so lopsided, we might not have declared C.R. England to be the prevailing party, we conclude that the district court's contrary conclusion was based on a reasoned approach that was grounded in its careful assessment of the circumstances of this case. So viewed, we see no abuse of the court's discretion.

CONCLUSION

¶72 For the foregoing reasons, we affirm the district court's ruling that C.R. England's noncompete agreements were enforceable under Utah law, reverse the district court's denial of Soar's motion for judgment as a matter of law on C.R. England's claim for tortious interference with economic relations, and affirm the district court's awards of both attorney fees and costs to C.R. England. We accordingly remand for a determination of fees reasonably incurred on appeal in relation to the claims for breach of the noncompete agreements.

———————